# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

RUNVEE, INC.,

      Plaintiff/Counterdefendant,

v.

UNITED STATES OF AMERICA,

      Defendant/Counterclaimant.

Case No. 2:10-CV-2260-KJD-GWF

**ORDER**

Presently before the Court is Plaintiff's Motion for Summary Judgment (#35).  Defendant filed a response in opposition (#36) to which Plaintiff replied (#41).

I.  Facts

Runde Shaw and his brothers started a successful film business in Shanghai, China during the 1920s.  The business later moved to Hong Kong.  At some point, he split off from his brothers to start a business known by the name Shaw & Sons. (*See* Declaration of James E. Weaver in Support of Brief in Opposition to Plaintiff's Motion for Summary Judgment, Doc. No. 37, Tr. of Deposition of Marcus Shaw at 23:22 - 24:21, excerpts attached as Ex. A to Weaver Declaration (hereinafter "Ex. A.")).

For several decades, Shaw & Sons owned and operated a film distribution and movie theater business.  After Runde Shaw passed away in the mid-1970's, two of his seven sons, Vee Fong Shaw

1    and Vee Ing Shaw, managed Shaw & Sons on behalf of the seven sons and their families, who

2    inherited the business. (Ex. A at 24:22-25; 25:21-26:6).  Over time, the Shaw family divested its

3    theater business and diversified into other kinds of investments. (Ex. A at 26:10- 27:24).  The

4    diversification program included the purchase of real estate in California and Nevada. (PWC Mem.

5    at 1, Ex. B to Weaver Decl.).

6           Although Shaw & Sons ceased to own businesses or noncash assets, the family preserved

7    Shaw & Sons "as the company through which we do business here." (Ex. A at 94:25 - 96:12).

8    During the late 1990's, Marcus Shaw and John Shaw assumed day-to-day managerial responsibility

9    for the Shaw family's investments. (Ex. A at 29:6 - 31:14; see also Tr. of Deposition of John Shaw at

10   36:1 - 38:10, excerpts attached as Ex. C to Weaver Decl.).

11          By November 2003, the Shaw family had liquidated their California real estate holdings, and

12   the family was seeking to sell approximately 370 acres out of a 483 acre tract of undeveloped land

13   located near Las Vegas, Nevada (the "Nevada Property").  (Contract dated Nov. 10, 2003, Ex. D to

14   Weaver Decl.; see also Ex. B).  As a matter of form, title to the Nevada Property was held in the

15   name of Runvee Holdings, Inc., a Delaware company ("Runvee Holdings").  Runvee Holdings was,

16   in turn, a wholly-owned subsidiary of parent company Runvee Holdings (1986) Limited, a company

17   incorporated in Liberia ("Runvee Liberia"). (Ex. A at 74:2-78:5).

18          As a matter of economic reality, parent company, Runvee Liberia, served as an

19   instrumentality of the Shaw family. (See Ex. A at 77:21 -78:23; 79:3-20).  The seven branches of the

20   Shaw family collectively made all important corporate decisions after being consulted by Marcus and

21   John Shaw orally and/or through written circulars. (Ex. A at 32:15-36:9).  These written circulars

22   were not published under the letterhead of Runvee Liberia because the company was simply an

23   instrumentality of the family.  Runvee Liberia held no assets, other than cash equivalent assets,

24   except for shares of Runvee Holdings and Shaw and Sons. (Ex. A at 77:21-78:5; 92:13-19; 124:5-

25   17).

26

2

1    Runvee Liberia obtained funding identified on its books as "shareholder loans" from the

2    family. (Acct. documents at RUNVEE001340-42, Ex. E to Weaver Decl.; *see also* Ex. A at 201:13-

3    202:18; 205:9-25).  Runvee Liberia served as a conduit for funding the operations of Shaw & Sons.

4    (Ex. C at 83:2-13).  The Shaws did not keep regular minutes or records of corporate meetings for

5    Runvee Liberia. (Ex. A at 67:15-18)  Runvee Liberia had no employees. (Ex. A at 57:18-20).  When

6    asked what purpose Runvee Liberia served, Marcus Shaw could not answer other than to agree that it

7    might serve a tax planning purpose. (Ex. A at 79:8-17).

8    Runvee Liberia's wholly-owned subsidiary, Runvee Holdings, also served as an

9    instrumentality of the Shaw family.  As noted above, the Shaw family collectively made all important

10   decisions, after consultation with Marcus and John Shaw orally and/or through written circulars. (*See*

11   Ex. A at 32:15–36:9).  Moreover, as was the case with Runvee Liberia, Runvee Holdings had no

12   employees of its own. (Ex. A at 57:24–58:1).  Shaw & Sons handled real estate business matters for

13   both companies.

14   The Shaws structured Runvee Holdings' balance sheet for their own tax needs – and the

15   needs of parent Runvee Liberia.  In anticipation of a sale of the Nevada Property, the Shaws

16   recharacterized Runvee Liberia's equity stake in Runvee Holdings as debt.  The "debt" took the form

17   of a back-dated $27.95 million promissory note payable to Runvee Liberia that was purportedly

18   distributed to Runvee Liberia as a dividend in the fiscal year ending prior to the sale of the Nevada

19   Property. (Ex. A at 109:13-24; 111:16-112:21; *see also* Note, Ex. F to Weaver Decl.).  By purporting

20   to distribute the "dividend/note" to Runvee Liberia before Runvee Holdings realized substantial

21   earnings and profits, the dividend would not be subject to tax withholding. (Ex. B at 3-5).

22   This transformation of equity into debt facilitated the later "repatriation" of funds (after the

23   sale of the Nevada Property in May 2004) out of Runvee Holdings into Runvee Liberia, without

24   subjecting the flow of funds to a 30% United States withholding tax – a tax that would have

25

26

1   otherwise applied to a post-sale cash dividend of net proceeds.[1]  (*See* PWC Memo at 3-5).  The

2   transformation also facilitated the circular flow of funds that permitted Plaintiff to purchase" real

3   estate from Runvee Holdings with Runvee Holdings' cash.

4          The Shaw family, through Runvee Holdings and Runvee Liberia, owned what was, at the

5   time, one of the largest tracts of unimproved land in North Las Vegas. (Ex. A at 133:5-18).  The

6   property was in high demand and had appreciated in value. (*Id*.)  In November 2003, the Shaws

7   contracted to sell approximately 372 acres of the Nevada Property to a third party buyer, Centex

8   Homes, for a price of $250,000 per acre. (Contract, Ex. D to Weaver Decl.).  This worked out to a

9   price of approximately $93 million.  Because the Nevada Property (in its 483-acre entirety) had an

10  adjusted tax cost basis of only approximately $4.2 million, the vast bulk of the sale price constituted

11  taxable gain. (*See* Ex. B at 3).

12         The family did not want to sell the remaining 111 acres of the Nevada Property at that time.

13  (Ex. A at 158:2-10).  They wanted to remain invested in the Las Vegas market. (Ex. A at 158:14-16).

14  The remaining acreage consisted of two parts: an unmarketable "bowtie" piece between railroad

15  tracks and an interstate highway (Ex. A at 154:12-25; 158:11-13) and "corners" pieces with

16  commercial development potential. (*See* Ex. A at 159:3-17).

17         The sale to Centex closed on May 24, 2004. (Ex. H to Weaver Decl.).  After accounting for

18  adjustments and other corporate expenses, Runvee Holdings ended up with about $88.8 million in

19  cash on account of the sale, almost all of which represented taxable gains. (HSBC Stmt. at

20  RUNVEE000209, Ex. I to Weaver Decl.).  Runvee Holdings also continued to hold title to the 111-

21  acre remainder of the Nevada Property.

22

23         [1]Distribution of cash proceeds in the year of the sale could, up to the amount of the "dividend/note," then be
    characterized as a repayment of debt rather than a dividend subject to withholding. There is circumstantial evidence,
24  which the Court takes as true on the motion for summary judgment looking at the evidence in the light most favorable to
    non-movant Defendant United States, suggesting that the "dividend/note" was created and signed during the fiscal year of
25  the sale of the Nevada Properties but was back-dated to the prior year. (E-mail dated August 8, 2003, Ex. G to Weaver
    Decl.;Ex. A at 113:1 – 114:2; 114:10 – 121:22; *but see* Ex. C at 334:5 – 347:25). The inference to be drawn, which is
26  relevant to their intention, is that the Shaws avoided payment of withholding tax by backdating the note.

4

1        Sometime between November 2003, when Runvee Holdings contracted with Centex, and the

2  closing on the sale to Centex in May 2004, Marcus and John Shaw met with advisors from

3  PriceWaterhouseCoopers ("PWC") to discuss their tax situation. (Ex. A at 237:16-239:2).  PWC

4  suggested that they find a "buyer" for Runvee Holdings who could offset the large gains to be

5  realized from the sale of the Nevada Property with tax losses, prior to the close of Runvee Holdings'

6  fiscal year on July 31, 2004. (Ex. A at 230:17 – 231:5).

7        The taxable gains to be avoided would not to be limited to the gains generated through the

8  sale to Centex Homes.  The Shaw family contemplated transferring the remaining 111 acres to a new

9  affiliate, the Plaintiff, which would replicate the function served by Runvee Holdings, except that a

10  nominal "purchase" by Plaintiff would result in a step-up in the tax cost basis of the remaining

11  acreage to about $27.8 million. (*See* Closing Checklist, Ex. J to Weaver Decl.).  The funds used for

12  this nominal "purchase" were to be the very same funds held inside Runvee Holdings that would be

13  temporarily transferred through a series of entities controlled by the Shaw family to Plaintiff before

14  returning, in circular fashion, back to Runvee Holdings as consideration for this "purchase." (*Id.*; *see*

15  *also* summary of circular flow of funds, RUNVEE000206, attached as Ex. K).

16        Once funds utilized for the "purchase" circled back to Runvee Holdings, and after Runvee

17  Holdings held nothing except cash (subject to looming tax liabilities on gains), a "buyer" would

18  "purchase" the company for a price somewhat greater than the net economic value of the company

19  (after subtracting for taxes owed on gains), thus providing the seller with a premium, but for a price

20  somewhat less than the cash balances held by the company, representing compensation to the buyer

21  for purporting to take the tax liability off of the hands of the seller. (*See* Ex. A at 230:17 – 231:5).  In

22  short, the parties to the transaction would carve up and split the taxes avoided between themselves.

23        The Shaws came to understand from their advisors that, in a tax-motivated transaction of this

24  kind, the seller would take about two-thirds of the tax obligation "saved" in the form of an inflated

25  price, with the buyer keeping cash in the company equal to about one-third of the tax obligation. (Ex.

26  A at 230:17 - 231:5).  After meeting with PWC, Marcus and John Shaw met in April 2004 with

1  representatives of International Counselors and Advocates ("ICA"), a purported investment banker

2  and law firm with a history of facilitating transactions structured to avoid taxes.

3       In May 2004, ICA introduced Marcus and John Shaw to Douglas Mullins, the principal

4  behind a potential "buyer," Desert Flower. (Ex. L at 1-2).  Time was of the essence, because Runvee

5  Holdings' tax year ended on July 31. (Ex. A at 265:21-24).  Desert Flower's principal, Mr. Mullins,

6  first proposed, through a letter of intent sent to the Shaws on May 10, 2004, that the transaction be

7  structured as a so-called Section 1031 exchange, whereby gains from the sale of real estate could be

8  deferred through the designation of, and later, the closing on, qualified "exchange" property. (ICA

9  Mem. at 2, Ex. L to Weaver Decl.).  The inference to be drawn from Mullins' proposal was that

10 Desert Flower did not possess ready-to-use losses that could immediately offset Runvee Holdings'

11 gains during the then-current tax year – a tax year with only weeks remaining.

12      Marcus Shaw rejected the Section 1031 proposal in an e-mail dated May 20, 2004, observing,

13 "in particular the interposition of the intermediate holdco is likely to attract IRS attention."  He

14 insisted on a simple "sale" of Runvee Holdings for cash. (Ex. M to Weaver Decl. at

15 RUNVEEE001131).  Desert Flower would have to make the transaction work as originally planned.

16      Mullins acceded to Shaw's demand with a new proposal reflective of the scheme that had

17 been originally hatched by the advisors to the Shaws. (Ex. N).  The new proposal contemplated that

18 Desert Flower would acquire all outstanding shares of Runvee Holdings pursuant to a Stock

19 Purchase Agreement ("SPA") for a price roughly reflective of the 2/3 and 1/3 split of taxes to be

20 avoided.  For this proposed transaction to "work," from a tax standpoint, the Shaws understood that

21 the "buyer" had to possess the requisite tax attributes – *i.e.*, losses that could somehow legitimately

22 offset gains realized by Runvee Holdings. (*See* Ex. A at 243:25-244:4).  But the Shaws were already

23 likely suspicious, on account of the initial Section 1031 proposal, that this might present a problem

24 for Desert Flower.

25      However, the Shaws and their representatives did not follow up with any due diligence with

26 respect to Desert Flower prior to closing on the transaction in mid-June 2004.  They could have, but

1   apparently did not, inquire as to the tax attributes of Desert Flower, *i.e.*, whether it possessed tax

2   losses. (*See* Ex. A at 310:22-311:5).  They could have, but apparently did not, inquire how such

3   losses, if they existed, would offset Runvee Holdings' gains in a legal manner.  They did not inquire

4   as to Desert Flower's prior income history. (*See* Ex. A at 256:8 - 257: 25).  Nor did they ask for or

5   obtain a balance sheet to ascertain whether Desert Flower had the capability to pay a tax liability, in

6   the event something went awry with the loss offset plan. (*Id.*)  Nor does the record reflect any effort

7   on the part of the Shaws to undertake something as simple as a credit check with respect to Desert

8   Flower and/or its principals.  Instead, the Shaws obtained some general character and background

9   references with respect to Mullins and nothing more.  There was a lack of serious inquiry by very

10  sophisticated businessmen.

11       The law firm of Heller Ehrman served as the Shaws' legal representative and advisor with

12  respect to the proposed "sale" to Desert Flower.  Sometime between May 24, 2004 (the closing date

13  on the sale of 370 acres to Centex) and the closing on the nominal "purchase" by Plaintiff of the 111

14  acres a few days later on May 27, 2004, Heller Ehrman wrote a memorandum to the Shaws

15  confirming that the transaction with Desert Flower might entail risk of civil or criminal penalty or

16  even potential transferee liability for unpaid taxes. (Heller Memorandum at 1-2, Ex. O to Weaver

17  Decl.).  John and Marcus Shaw admit to having likely read the Memorandum prior to closing on the

18  "sale."  Indeed, it is highly likely that they were advised as to the contents of the Memorandum well

19  before its June 11 date. (Ex. O).  The Memorandum therefore provides a window into the state of

20  mind of the Shaws and their representatives with respect to the scheme.

21       The Memorandum and a closing checklist clearly consider the steps involved in the circular

22  "purchase" by Plaintiff and the ensuing "sale" to Desert Flower as a coordinated transaction to avoid

23  tax. (Ex. O, J).   The Memorandum reflects an understanding that Desert Flower "may cause Target

24  [Runvee Holdings] to distribute its cash proceeds to repay the bridge financing" that Desert Flower

25  would utilize to "buy" the stock of Runvee Holdings. (Ex. O at 4).  In other words, the Shaws

26  understood that Desert Flower might well strip Runvee Holdings down to a shell.  This, apparently,

1   was deemed to be acceptable, as long as they did not take an "overt" hand in the stripping. (*See id*. at

2   3). The Memorandum reflects an understanding that such a stripping out of cash would leave

3   Runvee Holdings "insolvent, if the cash remaining in Target after the distribution was less than the

4   [$34.5 million tax] Liability." (Ex. O at 5 n. 5).

5       The Memorandum opines that the Shaws will not "be committing any act that is overtly

6   unlawful; they are merely selling stock." (Ex. O at 3). According to the Memorandum, the key to

7   avoiding civil or criminal penalties (or for that matter, transferee liability as discussed therein) is to

8   ensure that "no clear evidence [exists] that the person knew enough about the details of a scheme that

9   such person should have suspected illegal behavior." (*Id*. at 3). In short, the Memorandum reflects

10   an ostrich strategy. It was best to not know very much about Desert Flower or its plans. (*See id*.).

11       Because the Shaws and/or their representatives understood that they faced potential transferee

12   liability and even civil or criminal penalties if they knew too much, it maybe inferred by a fact finder

13   at trial that their studious avoidance of any investigation into the financial and tax attributes of Desert

14   Flower reflects a culpable state of mind and their intent to evade tax.

15       The Memorandum also sheds light on otherwise inexplicable provisions contained

16   in the Stock Purchase Agreement ("SPA") for the "sale" of Runvee Holdings. For example, Desert

17   Flower warrants that it was purchasing Runvee Holdings "for purposes of investment only, for its

18   own account, and not with a view to distribution or resale therefore, in whole or part." (SPA at 11 §

19   4.1(f) , Ex. P to Weaver Decl.). Yet Desert Flower was buying a company that consisted solely of

20   cash. (*Id*. at 7 § 3.2(g)). And the Shaws were aware that Desert Flower might well finance its

21   purchase by stripping the cash out of the company. Drawing all inferences in favor of the

22   Government, it is reasonable to conclude that the Shaws and their representatives knew that this

23   representation was false and designed simply to insulate them from later recriminations during any

24   ensuing IRS investigation.

25       In addition, representatives for the Shaws insisted on an assignment clause in the SPA that

26   barred Desert Flower from assigning its interests in the SPA without permission of the Shaws. (*Id*. at

19 § 11.6).  This clause was the subject of extended negotiation. (Yee e-mails of June 4 & 7, 2004, Ex. Q to Weaver Decl.).  Indeed, this insistence on such a clause reflects an unease that is memorialized in notes of a phone conversation concerning the clause in which the Shaws' representative indicated that he "want[ed] to know who they [the Shaws] are selling to," even though the conversation took place several weeks after Desert Flower was identified as the "buyer." (Tr. of Thompson Deposition at 69:1-9, Ex. R to Weaver Decl.; see also Handwritten Notes at US-RUNVEE0003170, Ex. S to Weaver Decl.).  The inference to be drawn is that the Shaws understood that Desert Flower might well not possess requisite tax attributes needed to offset over $100 million in gains.

To the extent that the Shaws did not already understand that Desert Flower lacked requisite tax attributes or, alternatively, an ability to pay tax, they were clearly put on notice of the situation prior to closing when their attorney received copies of the Certification for Desert Flower, along with initial incorporation documents that indicated that the company was newlyformed and initially capitalized with $1.00. (Ex. T to Weaver Decl.).

Desert Flower was not a pre-existing company with pre-existing losses.  It was a brand new company.  Mr. Mullins did not even finish setting up Desert Flower as an Isle of Man corporation until May 26, 2004. (Ex. T at 1).  Marcus Shaw claims to have not known that Desert Flower was a brand new company (Ex. A at 284:17-285:13), but it is reasonable to infer from the totality of the evidence that, at a minimum, the Shaws (and/or their representatives) knew Desert Flower brought no substantial assets nor tax losses to the table.  In fact, there are strong reasons to infer that Heller Ehrman knew this in late May/early June 2004. (*See* Ex. O); *see also* e-mails regarding assignability issue, reflecting a nervousness that Desert Flower might simply flip Runvee Holdings, Ex. Q at US-RUNVEE003171 & 3608).

There is also no reason, at the summary judgment stage, to take Mr. Shaw's self serving recollections at face value.  Taken collectively, this evidence contradicts the averments made by Mr. Shaw in paragraphs 33-34, 36, 51-52 and 61 of his Declaration.

1    As reflected in the Heller Ehrman Memorandum (Ex. O) and Closing Checklist (Ex. J), the

2    first step in the implementation of the Shaws' tax evasion scheme entailed the nominal "purchase" of

3    the remaining 111-acre tract held by Runvee Holdings.  As a predicate to this series of steps, two

4    new companies were hastily created to replicate the alter-ego relationship that the Shaws had with

5    Runvee Holdings and its parent company, Runvee Liberia.  As to Runvee Liberia, a new holding

6    company, Sedgeford Ltd. ("Sedgeford") (later changed to "Runvee Holdings Ltd.") was created in

7    late April 2004 to serve the exact same function as had Runvee Liberia. (*See* Ex. A at 161:4 –

8    169:13; *see also* Ex. C at 94:4-7 & 149:4-14 (characterizing Sedgeford as a "successor" and a

9    "clone" of Runvee Liberia)).

10   Sedgeford had the same beneficial owners as did Runvee Liberia. (Ex. A at 161:4 - 169).  It

11   essentially had the same directors and managers. (*Id*.)  The set-up was designed to parallel the

12   Runvee Liberia/Runvee Holdings set-up. (*Id*.)  As was the case with Runvee Liberia, Sedgeford was

13   to serve as the parent company for Shaw & Sons and a newly-created company named Runvee, Inc.

14   (*Id*.)  As was the case with Runvee Liberia, the owners of Sedgeford did not keep corporate minutes

15   or hold formal meetings for the company. (*Id*. at 67:6 – 68:4).

16   The successor to Runvee Holdings was given the name Runvee, Inc. (the Plaintiff).  Plaintiff

17   was created in early May 2004 to serve the same function as had Runvee Holdings: to hold the

18   Nevada Property, at least the remainder not sold to Centex. (Ex. A at 176:22 – 177:4).  As was the

19   case with Runvee Liberia and Runvee Holdings, neither Sedgeford nor Runvee, Inc. had employees.

20   (*See id*. at 57:16-20). The capital structure of Runvee, Inc. had no economic rhyme or reason to it: it

21   was designed for tax purposes. (*Id*. at 173:16 – 174:20).

22   In accordance with the pre-planned scheme, on May 25, 2004 (one day after the closing of the

23   sale to Centex Homes) Runvee, Inc. contracted, without negotiation, to "purchase" the 111-acre

24   property from Runvee Holdings for $27.795 million.  (*See* Runvee, Inc. / Runvee Holdings Contract,

25   Ex. U to Weaver Decl.).  This price worked out to the very same $250,000 per-acre price paid by

26   Centex Homes.  As reflected in correspondence, the Shaws went to some trouble to imbue the

10

1    transaction with an appearance of being "arms-length." (Ex. V to Weaver Decl.).  On the same day as

2    the signing of the Runvee, Inc. / Runvee Holdings contract, the Shaws set in motion a circular flow

3    of money to "pay" for this "asset sale" as follows: On May 25, 2004, Runvee Holdings transferred

4    $29.1 million to Runvee Liberia, purportedly as a repayment of the purported earlier promissory

5    note/dividend. (Ex. K).  The sum of $29.1 million was then transferred on the following day from

6    Runvee Liberia's account to Sedgeford's account. (*Id*.; *see also* Ex. A at 210:16 – 213:9) (Marcus

7    Shaw explained that the bank transfer from Runvee Liberia to Sedgeford was purportedly a shortcut

8    for a distribution from Runvee Liberia followed by contributions into Sedgeford by the seven

9    branches of the family).  On the following day, May 27, 2004, Sedgeford funded newly-created,

10   wholly-owned subsidiary, Runvee, Inc. with $29 million. (Ex. K).  Then, on May 28, 2004, Runvee,

11   Inc. utilized $27.8 million of the funds received from Sedgeford to "purchase" the remaining 110

12   acres from Runvee Holding. (Ex. K; *see also* Closing Statement for 111 acres, Ex. W to Weaver

13   Decl.).  The circle was now complete.  Title to the 111 acres now resided with Plaintiff, but all of the

14   funds previously held by Runvee Holdings remained with Runvee Holdings.

15          An expert retained by the Government, David LaRue, analyzed the series of steps described

16   herein and concluded, among other things, that the "beneficial interests of the Beneficial Owners of

17   the 111-acre property did not change as a result of the "purchase;" nor did the beneficial interest of

18   the Beneficial Ownership in the cash utilized to "purchase" the property. (Supp. Rept. of Dr. LaRue

19   dated May 22, 2012 at 4, Ex. X to Weaver Decl.).  Moreover, the further effect of the nominal

20   "purchase" was to render Runvee Holdings a lifeless shell of a company, holding only $85.8 million

21   in cash. (*Id*. at 3).

22          Thus, as of May 28, 2012, Runvee Holdings was an (approximately) $85 million all-cash

23   company, with a looming tax liability of approximately $34.5 million.  Plaintiff held title to the

24   remaining 111-acre parcel, purportedly with a stepped-up, fair market value cost basis.  (Ex. O at 6;

25   *see also* LaRue Rept. of Jan. 4. 2012 at 27-46, Ex. Y to Weaver Decl.).

26

11

1          Having completed Plaintiff's "purchase," the Shaw family implemented the final step in the

2    integrated scheme: the "sale" of stock of Runvee Holdings to newly formed Isle of Man corporation,

3    Desert Flower. (Ex. P).  Although this second steps was styled as a "sale" of stock by Runvee Liberia

4    to Desert Flower, purportedly financed by a third-party bank for a price of $75.25 million, an analysis

5    of the structure of the transaction by Dr. LaRue revealed that the transaction lacked any business

6    purpose or economic substance. (Ex. X at 5) ("The sole apparent function of Desert Flower in

7    acquiring the stock of Runvee Holdings was to assume responsibility for the mitigation or payment

8    of [the tax liability] . . . .")  The "sale" price was simply the amount of cash on hand in Runvee

9    Holdings, plus a negotiated percentage split between seller and buyer of the taxes to be avoided. (Ex.

10   X at 6; see also Ex. Q at RUNVEE003171 ¶9).

11         Although the transaction involved purported bridge financing, in reality, Desert Flower

12   simply stripped $76 million out of the coffers of Runvee Holdings to pay Runvee Liberia – a

13   meaningless transaction that enabled Desert Flower to pocket about $10 million, the economic

14   equivalent of a fee. (Ex. X at 7).  All three companies, Desert Flower, Runvee Liberia, and Runvee

15   Holdings, opened demand deposit accounts with Rabobank New York.  On June 16, 2004, the $85.8

16   million in cash held by Runvee Holdings was moved to its account with Rabobank.  On June 17,

17   2004, the date of the closing on the purported stock sale, an affiliate of Rabobank purported to "loan"

18   Desert Flower $80.5 million.  On the same day, Desert Flower transferred $75.25 million to Runvee

19   Liberia's account as payment for the stock of Runvee Holdings.  Then, still on the same day, Runvee

20   Holdings' new owners transferred $80.5 million to Desert Flower as a "loan."  To complete the loop,

21   Desert Flower then repaid the Rabobank affiliate back its "loan" with the funds taken out of Runvee

22   Holding's account.  At the end of the day, the Shaw family had received $75.25 million and Desert

23   Flower and its new purported subsidiary, Runvee Holdings, collectively retained about $10 million,

24   less bank fees. (See RABOBANK000259-73, Ex. Z to Weaver Decl.; *see also*, Tr. of Kortlandt

25   Deposition at 101:19-105:21, Ex. AA to Weaver Decl.).

26

1    Although the advisors to the Shaws sought to wall them off from knowledge of this stripping

2    operation, Rabobank's clerks forgot to change the address of record for Runvee Holdings' account,

3    which had been funded just prior to the closing on the "sale."  As a consequence, Rabobank

4    confirmations of balance transfers out of the Rabobank demand deposit account for Runvee Holdings

5    continued to be mailed to the Shaw family, during the time in which the vast bulk of the cash held by

6    Runvee Holdings was stripped out and transferred to other entities or individuals. (*See* Ex. AA at

7    129:13 – 131:24).  The Shaws did not report these irregularities to the IRS or make further inquiry.

8    Subsequent to stripping out the bulk of Runvee Holdings' cash, Desert Flower sold the shell

9    of Runvee Holdings to an offshore entity, Tropicana. (Ex. Y at 47-51) on June 28, 2004.  Two days

10   later, Tropicana sold the shell of Runvee Holdings to another offshore entity, Sequoia.  Runvee

11   Holdings was re-named Investissements de Rinoceros de Menthe Verte, Inc. ("IRMV") and Sequoia

12   later purported to offset the taxable gains associated with Runvee Holdings with purported capital

13   losses. (Ex. Y at 47-56).

14   Runvee Holdings (as IRMV), a Delaware corporation, made its last corporate filing in

15   Delaware on July 15, 2004. (Ex. DD to Weaver Decl.).  It had no business to conduct and essentially

16   no assets. (*see* Ex. Y at 49-56).  Its corporate status has apparently been listed in Delaware as void

17   since March 1, 2006. (Ex. DD).

18   The IRS disallowed the losses claimed by the shell of Runvee Holdings/IRMV and assessed

19   over $35 million in taxes, plus additional interest and penalties. (Ex. BB to Weaver Decl.).  The IRS

20   recorded a Notice of Federal Tax Lien in Clark County, Nevada on November 13, 2009, identifying

21   Plaintiff as the nominee of Runvee Holdings/IRMV. (Ex. CC to Weaver Decl.)  Plaintiff then filed

22   the present action to quiet title.

23   II.  Standard for Summary Judgment

24   Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,

25   and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

26   material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ.

13

P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex</u>, 477 U.S. at 323.  The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

All justifiable inferences must be viewed in the light must favorable to the nonmoving party. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.  However, the nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine issue for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  The court need only resolve factual issues of controversy in favor of the non-moving party where the facts specifically averred by that party contradict facts specifically averred by the movant.  <u>See</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990); <u>see also</u> <u>Anheuser-Busch, Inc. v. Natural Beverage Distribs.</u>, 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).  Evidence must be concrete and cannot rely on "mere speculation, conjecture, or fantasy.  <u>O.S.C. Corp. v. Apple Computer, Inc.</u>, 792 F.2d 1464, 1467 (9th Cir. 1986). "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment. <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002).

Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.  Summary judgment shall not be granted if a reasonable jury could return a verdict for the nonmoving party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248.

<u>III.  Analysis</u>

A federal tax lien reaches "all property and rights to property, whether real or personal," belonging to a taxpayer who fails to pay taxes assessed upon demand.  26 U.S.C. § 6321.  This

14

1   includes property in the hands of a nominee or alter-ego of the taxpayer.  *See G.M. Leasing Corp. v.*

2   *United States*, 429 U.S. 338, 348-51 (1977).  It also includes property in the hands of a successor

3   corporation, where a purchaser of the taxpayer's assets is a mere continuation of the taxpayer or

4   where the transaction is fraudulently entered into.  *See Today's Child Learning Center, Inc. v. United*

5   *States*, 40 F. Supp. 2d 268, 272 (E.D.  Pa. 1998).

6       State law is applied to determine what rights, if any, a taxpayer has in property; federal law is

7   applied to determine if these rights qualify as "property" within the meaning of § 6321.  *Drye v.*

8   *United States*, 528 U.S. 49, 58 (1999).  The nature of a taxpayer's equitable rights in a property held

9   by another has been construed by the Ninth Circuit to be a question of state law. *See Wolfe v. United*

10  *States*, 806 F.2d 1410, 1411 (9th Cir. 1986).

11      Here, the United States filed a Notice of Federal Tax Lien against the property at issue in this

12  case, held by Plaintiff as nominee of Runvee Holdings.  In adjudicating the validity of this lien, the

13  United States relies on a number of state law claims, including theories based on fraudulent

14  conveyances and concepts drawn from law regarding the piercing of a corporate veil.  *See Leeds LP*

15  *v. United States*, 2010 WL 3070349 at \*8 (S.D. Cal. Aug. 5, 2010)(*citing Dalton v. Commissioner*,

16  2008 WL 2651424 at \*8 (U.S. Tax. Ct. 2008)).  As set forth in its Amended Answer and

17  Counterclaim, the United States raises three claims as affirmative defenses, and, in addition, has

18  advanced a counterclaim against Plaintiff to set aside its "purchase" under the Nevada fraudulent

19  transfer statute.

20      Three kinds of transfers may be set aside under Nevada's Uniform Fraudulent Transfer Act:

21  actual fraudulent transfers (N.R.S. §112.180(1)(a)), constructive fraudulent transfers (N.R.S. §

22  112.180(1)(b), and transfers made by insolvent debtors. (N.R.S. § 112.190); *see also Herup v. First*

23  *Boston Financial, LLC*, 123 Nev. 228, 233 (2007).  Defendant has raised genuine issues of material

24  fact from which a fact finder could conclude that the transfer of 111 acres from Runvee Holdings to

25  Plaintiff meets the elements for proving actual and constructive fraud.  In addition, a fact finder could

26  conclude that the transfer occurred at a time when Runvee Holdings was economically insolvent.

1    A.  Transfer to Plaintiff may have been made with actual intent to evade tax

2    Defendant has established that genuine issues of fact exist requiring a trier of fact to

3 determine whether the transfer to Plaintiff was made with actual intent to evade tax.  A transfer made

4 by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer

5 was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation

6 "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." N.R.S. 112.180(1)(a).

7    Factors which may be considered in making this determination include:

8   (a) The transfer or obligation was to an insider;
   (b) The debtor retained possession or control of the property transferred after the
9   transfer;
   (c) The transfer or obligation was disclosed or concealed;
10   (d) Before the transfer was made or obligation was incurred, the debtor had been sued
   or threatened with suit;
11   (e) The transfer was of substantially all the debtor's assets;
   (f) The debtor absconded;
12   (g) The debtor removed or concealed assets;
   (h) The value of the consideration received by the debtor was reasonably equivalent
13   to the value of the asset transferred or the amount of the obligation incurred;
   (i) The debtor was insolvent or became insolvent shortly after the transfer was made
14   or the obligation was incurred;
   (j) The transfer occurred shortly before or shortly after a substantial debt was
15   incurred; and
   (k) The debtor transferred the essential assets of the business to a lienor who
16   transferred the assets to an insider of the debtor.

17 N.R.S. § 112.180(2); see also *Herup*, 123 Nev. at 233-34.

18    In response to Plaintiff's motion for summary judgment, the United States has raised genuine

19 issues of material fact regarding whether the "purchase" by Plaintiff was part of an integrated scheme

20 to evade payment of Runvee Holdings' income tax liabilities incurred upon the sale of its Nevada

21 Property.  Applying the factors listed above to the facts of this case, viewed in a light most favorable

22 to the non-movant, a compelling case for actual fraud exists which must be determined by a trier of

23 fact.  Considering the relevant factors, Defendant has raised the following issues of material fact:

24    With respect to factor "(a)" whether Plaintiff and Runvee Holdings were closely-related

25 affiliates and alter-egos of the Shaw family.  Plaintiff concedes that it qualifies as an "insider." (SOF

26 ¶¶6-7, 11, 43-44);

With respect to factor "(b)," whether the Shaw family, as the alter-ego of Runvee Holdings, "retained possession or control of the property transferred" to the Plaintiff, treating Plaintiff as their new mere instrumentality (SOF ¶¶44-45, 47-48);

With respect to factor "(e)," whether the transfer, when combined with the second step of the Shaws' unified scheme – the "sale" to Desert Flower, and the anticipated stripping of cash from the company, constituted "substantially all the debtor's assets." (SOF ¶¶47, 49-51);

With respect to factor "(f)," whether one may reasonably infer from the evidence that the Shaw family intended for the shell of Runvee Holdings to disappear from the scene under the auspices of its new Isle of Man owner;

With respect to factor "(g)," whether the Heller Memorandum clearly contemplated the possibility that Desert Flower would strip out assets from Runvee Holdings to pay the Shaw the "sale" price;

With respect to factor "(h)" whether Runvee Holdings did not receive "reasonably equivalent to the value" for the transfer: to the contrary, Plaintiff "paid" for the 111-acre parcel with Runvee Holdings' own funds through a circular flow of funds that lack economic meaning and that may have also violated U.S. tax law with respect to withholding taxes;

With respect to factor "(i)" whether Runvee Holdings "became insolvent shortly after the transfer," as expressly contemplated by the Heller Ehrman Memorandum, with Desert Flower stripping out cash to "pay" for its purported stock purchase;[2]

---

[2]As contemplated in the Heller Memorandum, Runvee Holdings became economically insolvent on June 17, 2004, if not sooner, when Desert Flower stripped out its cash.  Contrary to the analysis contained in fn. 1 of Plaintiff's motion (p. 14), under the facts of this case, the tax liability arising out of the sale of 370 acres to Centex Holdings became fixed and determined – and therefore accrued for accounting purposes, on or about May 24, 2004. (Tr. of La Rue Depo. 135:1-136:22, Ex. EE to Weaver Decl.).  Runvee Holdings had no capacity to generate tax losses to offset gains realized in May 2004 during the last weeks of its tax year, and there was no legal means available to acquire losses that would ameliorate the taxes arising from the May transactions. (*Id.*); *see also*, *Feldman v. Commission*, T.C. Memo. 2011-297 at *15 (IRS qualified as creditor at time of sale in an intermediary transaction asset sale); NRS 112.150 (definition of creditor under UFTA includes contingent claims).  The cases cited by the Plaintiff do not support the theory that the Court should ignore what the Shaws knew and did prior to the close of the July 31, 2004 tax year.  Although in *United States v. Brown*, 820 F.Supp. 374, 383 (N.D.Ill 1993), the court stated that tax liabilities "become due and owing on the date that the returns are required to be filed" rather than on "the date of the assessment," that does not mean that liabilities

17

1    Similarly, with respect to factor "(j)," whether "the transfer occurred shortly before or shortly

2    after a substantial debt was incurred" in the form of tax liabilities arising out of the sale of the

3    Nevada Properties.

4    It appears that Plaintiff attempts to artificially separate the two-step tax evasion scheme into

5    distinct pieces, maintaining that the "purchase" by Plaintiff was unrelated to the ensuing "sale" to

6    Desert Flower.  While in the end, this will ultimately be a question of fact, Defendant has presented

7    compelling evidence that the two steps were carefully coordinated to occur in a tight sequence.

8    Especially considering that Plaintiff and Runvee Holdings (along with their respective parent

9    companies) were mere instrumentalities of the Shaw family.  Looking at the disputed facts in a light

10   most favorable to Defendant, it appears that Plaintiff's "purchase" was a mere shifting of assets from

11   one pocket to another, and lacked any real economic consequence.

12   In resolving a motion for summary judgment, all justifiable inferences must be viewed in the

13   light must favorable to the nonmoving party.  See Matsushita, 475 U.S. at 587.  Thus, it may be

14   inferred that the Shaws and their representatives knew that Desert Flower lacked tax attributes to

15   offset Runvee Holdings' gains with losses, lacked financial resources to pay Runvee Holdings' tax

16   obligations, and would render Runvee Holdings insolvent and unable to meet its tax obligations.  In

17   short, the dispute as to whether Plaintiff's purchase was made with actual intent to hinder, delay or

18   defraud the United States turns on a number of fact-intensive determinations that can only be made at

19   trial.

20   B.  Transfer to Plaintiff may constitute constructive fraud

21   A transfer made by a debtor is also fraudulent as to a creditor if the debtor made the transfer

22   or incurred the obligation "[w]ithout receiving a reasonably equivalent value in exchange for the

23   transfer or obligation, and the debtor . . . believed or reasonably should have believed that the debtor

24   would incur, debts beyond his or her ability to pay as they became due." NRS § 112.180(1)(b)(2).

25   ───────────────

26   may not accrue for purposes of an insolvency analysis, if, as in this case, the facts and circumstances render the liabilities
     fixed and determined prior to the close of the tax period.

1    For the same reasons outlined above, a trier of fact may infer that Runvee Holdings did not

2    receive reasonably equivalent value in exchange for the "purchase" by Plaintiff of the 111-acre parcel

3    at issue.  As a matter of economic reality, Defendant has raised genuine issues of material fact from

4    which it may be inferred that Runvee Holdings received no value whatsoever for the transfer.

5    Moreover, genuine issues exist from which the trier of fact may infer that the Shaw family knew or,

6    at a minimum "reasonably should have believed" that Runvee Holdings would be unable to pay its

7    tax debts.

8        C.  Alternatively, Runvee Holdings was insolvent at time of transfer

9        Even if one were to accept the "state of mind" averments contained in the Shaw Declaration

10   at face value (and there is no reason to do so for purposes of summary judgment), Plaintiff's

11   "purchase" may still be subject to avoidance under the UFTA.  "A transfer made or obligation

12   incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . .

13   if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent

14   value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor

15   became insolvent as a result of the transfer or obligation.  If the transfer to Plaintiff is considered to

16   be part of a unified scheme to evade tax, then, Runvee Holdings became insolvent no later than the

17   close of the "sale" to Desert Flower on June 17, 2004.

18       D.  Distinguishable Case Law

19       Plaintiff misconstrues and misapplies a line of seven Tax Court cases that concern application

20   of 26 U.S.C. § 6901, a federal transferee liability statute contained in the Internal Revenue Code.

21   Those cases include: *Feldman v. Commission*, T.C. Memo. 2011-297; *Diebold v. Commissioner*,

22   T.C. Memo 2010-238; *Salus Mundi Foundation v. Commissioner*, T.C. Memo. 2012-61; *Griffin v.*

23   *Commissioner*, T.C. Memo. 2011-61; *LR Development Company LLC v. Commission*er, T.C. Memo.

24   2010-203; *Frank Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011-298; *Starnes v.*

25

26

1  *Commissioner*, T.C. Memo. 2011-63, 680 F.3d 417 (4th Cir. 2012).[3]  The cases are all

2  distinguishable on the basis that they were established on facts developed at trial.  All the cases

3  involved fraudulent transfer claims and were decided after factually intensive presentations of

4  evidence.

5       Some of the cases cited by Plaintiff also involved sales of all-cash companies to

6  intermediaries (following the liquidation of non-cash assets).  However, a fundamental distinction

7  between the cited cases and present cases remains.  This case involves a direct transfer between the

8  taxpayer, Runvee Holdings, and Plaintiff.  In the *Starnes* line of cases, the Government sought to

9  recharacterize the stripping out of cash by a buyer of a company (to pay the sellers for the purchase

10  of the company's stock) as a fraudulent transfer of cash from the company to its former shareholders.

11  *See id*.

12       There is nothing wrong with that theory, provided the Government can show that the form of

13  the transaction should be disregarded.  Indeed, the Government advances a similar argument below,

14  in connection with its alter-ego, successor liability and nominee claims.  However, in contrast to the

15  *Starnes* line of cases, there is no need to recharacterize the "sale" to Desert Flower in order to prove

16  that the direct transfer of property to the Plaintiff was fraudulent.  The Government has asserted a

17  more direct case of fraudulent transferee liability.

18       To the extent the facts of the cases parallel this one, the most apposite of the cases is the

19  *Feldman* case – a case in which the Tax Court concluded that the purported "sale" of stock and

20  payment to the former shareholders constituted a fraudulent transfer.  In *Feldman*, the Tax Court

21  focused on several factors that parallel this case.  *See* T.C. Memo. 2011-297 at *12-14. *Id*.

22       First, the bridge loan to the purchaser of the stock was funded with the cash of the Target. *Id*.

23  at *12-13.  Second, at the time of transfer to the purchaser, the Target's assets consisted of only cash

24  and all operating assets had already been sold – the Target did not have any business activities. *Id*. at

25  _____

26  [3]On July 16, 2012, the Government filed a petition for rehearing, *en banc*, in *Starnes*.  The Court was unable to locate a disposition of the Government's motion.

1   \*13.  Third, the Target "was nothing more than a shell, with no employees, no real property, and no

2   assets other than the [purchaser's] share of the unpaid taxes." *Id.*  Fourth, the real price paid by the

3   purchaser was for the stock had nothing to do with the value of the Target but rather entailed splitting

4   the purported tax savings. *Id.* at 14.  Finally, the purchasers had no intention of ever paying the tax

5   liabilities. *Id.* at \*13-14.  The Government has raised genuine issues of fact in this case that could

6   result in similar findings.

7           E.  The sale to Desert Flower

8       The Government has also raised genuine issues of fact that could allow a fact finder to

9   determine that the "sale" to Desert Flower was a fiction.  The admissible evidence produced by non-

10   movant Defendant could allow a reasonable finder of fact to infer that the agents of Runvee Liberia

11   (and its owners) knew or intentionally chose not to know, that the stock sale to Desert Flower was, in

12   substance, nothing more than a device to allow them to receive Runvee Holdings' cash without full

13   subtraction for the tax liability.  For example, the representation in the SPA that Desert Flower was

14   acquiring Runvee Holdings for "investment" is subject to inquiry for veracity, because Desert Flower

15   acquired nothing more than a corporate shell with cash.  Moreover, genuine issues of fact have been

16   raised regarding whether the Shaws understood that the price was a function of the anticipated tax

17   avoided.  Looking at the facts in a light most favorable to Defendant, the Heller Ehrman

18   Memorandum reflects an understanding that Desert Flower might strip out Runvee Holdings' cash to

19   pay for its shares.  Furthermore, Shaw representatives learned that Desert Flower was a brand new

20   company initially capitalized for \$1.  It is therefore clear that it could reasonably be inferred that the

21   Shaws either knew (or intentionally chose not to know) that Runvee Holdings would have no reason

22   to exist after the "sale."

23       The substance of a transaction, and not its form, governs its consequences. *See Kline v.*

24   *Robinson*, 83 Nev. 244, 250 (1967), *overruled in part (on other grounds)*, *Pease v.Taylor*, 88 Nev.

25   287 (1972); *see also Robinson v. Durston*, 83 Nev. 337, 339-40, 350-52 (1967).  "The substance of

26

1   the transaction is its commercial content and economic meaning." *Swallow Ranches, Inc. v. Bidart*,

2   525 F.2d 995, 998 (9th Cir. 1975) (discussing Nevada law)).

3        "What the law does not permit a taxpayer to do in seeking to avoid taxes is to cast

4   transactions in forms when there is no economic reality behind the use of the forms." *Owens v.*

5   *Commissioner*, 568 F.2d 1233, 1237 (6th Cir. 1977).  In *Owens*, the taxpayer purported to sell an all-

6   cash company to third parties for cash.  The Court of Appeals disregarded the sale, finding four

7   circumstances that led to the conclusion that the taxpayer had not sold the equity in his business: (1)

8   the corporation "had only cash as an asset," (2) the corporation "carried on no business activity and

9   thus was a lifeless shell at the time of the purported sale of stock," (3) "taxpayer was the sole

10  shareholder of [the corporation] and thus was in exclusive control of the corporation," and (4) the

11  purported stock purchasers withdrew all the cash from the corporation to finance the loan used for

12  the purchase price. *Id*. at 1239-40.  Under these circumstances, which also exist in this case "[w]hat

13  taxpayer actually sold to [the third parties] was the right to distribute a quantity of cash to

14  themselves.  Moreover, that right to a distribution of cash was in substance no different than the cash

15  that taxpayer received for the stock." *Id*. at 1240; *see also Lowndes v. United States*, 384 F.2d 635,

16  637-38 (4th Cir. 1967).

17       For the reasons discussed in *Owens*, the Court could at trial disregard the fictional "sale" to

18  Desert Flower.  If the "sale" is disregarded, one of two consequences follows: Plaintiff should

19  be found to be the mere continuation of Runvee Holdings or, in the alternative, Plaintiff should be

20  found to be the alter-ego and nominee of the Shaws and their alter-ego, Runvee Holdings.

21       F.  Plaintiff may be characterized as the mere continuation of Runvee Holdings

22       Under Nevada law, a buyer of assets may be characterized as a mere continuation of the seller

23  if "(1) only one corporation remains after the transfer of assets; and (2) there is an identity of stock,

24  stockholders, and directors between the two corporations." *Village Builders 96, L.P. v.U.S.*

25  *Laboratories, Inc.*, 121 Nev. 261, 274 (Nev. 2005) (citation omitted); *see also Lamb v. Leroy Corp.*,

26

1  85 Nev. 276, 279 (1969).  Defendant has raised genuine issues of fact that require resolution by a

2  finder of fact regarding whether Plaintiff meets both characteristics.

3  First, the Plaintiff is the sole surviving corporation as between Plaintiff and its predecessor,

4  Runvee Holdings. The last corporate filing for Runvee Holdings in Delaware occurred on or about

5  July 15, 2004, shortly after the Plaintiff's "purchase" and the ensuing "sale" to Desert Flower.  That

6  filing was a name change – which Defendant asserts should be inferred as designed to erase any

7  connection with the Shaws, as required under the terms of the SPA. (Ex. P at 15 § 8.2).

8  Alternatively, and looking past mere formalisms, if one disregards the "sale" to Desert

9  Flower, then, Plaintiff (or alternatively the Shaws) must be the successor to Runvee Holdings.

10  Second, there is a compelling identity at all levels between Plaintiff and Runvee Holdings.  The sole

11  business asset of Runvee Holdings resides with Plaintiff.  Plaintiff's alter-ego is the transferee of

12  Runvee Holdings' cash, minus fees paid to Desert Flower. (SOF ¶¶ 6-7, 11, 14, 43-47, 50-56).  The

13  same beneficial owners of Runvee Holdings now own Plaintiff; the same persons who managed

14  Runvee Holdings now manage the Plaintiff.  The only difference between the two is the omission of

15  "Holdings" from Plaintiff's corporate name.  In sum, Plaintiff is a "mere continuation" of Runvee

16  Holdings.

17  G.  Alternatively, Plaintiff may be the alter-ego and/or nominee of Runvee Holdings

18  Alter-ego liability entails proof of three elements: "(1) the corporation is governed and

19  influenced by the people [or entity] asserted to be its alter egos, (2) there is a unity of interest and

20  ownership such that the two are inseparable," and (3) "'adherence to the fiction of separate entity

21  would ... sanction a fraud or promote injustice.'"[12] *House of Brussels Choc. v. Whittington*, 2008 WL

22  6096451, at *2 (Nev. Nov. 3, 2008) (*citation omitted*).  The following factors may indicate the

23  existence of an alter-ego relationship: (1) commingling of funds; (2) undercapitalization; (3)

24  unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5)

25  failure to observe corporate formalities. *LFC Mktg. Group, v. Loomis,* 116 Nev. 896, 904 (2000).

26

1  Whether Plaintiff is the alter ego of Runvee Holdings is essentially a factual question.  *See Wolf v.*

2  *United States*, 798 F.2d 1241, 1243-44 n.2 ((th Cir. 1986).

3          In this case, the Shaw family treated both Plaintiff and Runvee Holdings as an extension of

4  themselves.  The capital structure created by the Shaws reflects a unity of interest between Plaintiff

5  and its beneficial owners – as does the circular flow of funds involved in Plaintiff's "purchase."

6  Moreover, under the circumstances of this case, and given the Shaw family's plan to evade over $35

7  million in taxes, a failure to disregard Plaintiff's corporate form would perpetuate an injustice on the

8  United States.  Finally, if the "sale" to Desert Flower is nothing more than a fiction, then Plaintiff is

9  surely also the nominee of the Shaw family and is holding title to the 111-acre property at issue on

10  their behalf.  *See Nelson v. United States*, 1990 WL 169245 at *3-4 (D. Nev. Sept. 27, 1990), *aff'd in*

11  *part (nominee analysis) and remanded on other grounds*, 942 F.2d 792 (9th Cir. 1991).

12  IV.  Conclusion

13          Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment

14  (#35) is **DENIED**.

15          DATED this 26th day of March 2013.

16

17

18          _____

19          Kent J. Dawson
           United States District Judge

20

21

22

23

24

25

26

24